# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | Case No. 24-CR-167-RAW |
| JASON JAVON FRANKLIN, MARIELLE TRAMANIE SMITH, SHERL DEAN BATISE, and NICHOLES ANDREW KERR, | |
| *Defendants*. | |

## OPPOSED JOINT MOTION TO DISMISS LATE NOTICES OF INTENT TO SEEK THE DEATH PENALTY OR, ALTERNATIVELY, MOTION TO CONTINUE TRIAL & MEMORANDUM OF LAW IN SUPPORT

COME NOW Defendants Franklin and Smith and submit this Joint Motion to Dismiss Late Notice of Intent to Seek the Death Penalty or, Alternatively, Motion to Continue Trial, and in support thereof submit the following argument and authorities. Undersigned counsel attempted to reach opposing counsel to ascertain their position on this motion, but were unable to do so. Because there is a high level of confidence the government will oppose the motion to dismiss the late Notices of Intent to Seek the Death Penalty, this motion is titled "Opposed"; however, undersigned counsel remain hopeful there can be at least some agreement on a continuance if the Motion to Dismiss is denied.

1

# TABLE OF CONTENTS

I. Introduction ............................................................................................................ 3

II. Background .......................................................................................................... 3

III. Legal Argument................................................................................................... 5

    A.   This Court should strike the government's July 9, 2025 Notices of Intent to Seek the Death Penalty as untimely. ................................................................................ 5

        1.   Nature of the Charges ............................................................................ 7

        2.   Nature of Aggravating Factors ............................................................ 8

        3.   Time Remaining Before Trial ............................................................... 8

        4.   Status of Discovery ............................................................................... 14

    B. Permitting the government to seek the death penalty would violate the Fifth Amendment's Due Process Clause. .................................................................... 15

IV. Alternatively, if the Court will not strike the Notices of Intent to Seek the Death Penalty, then the Court should continue the trial for a minimum of 24 months to allow sufficient time to prepare for trial and any potential sentencing phase. ............................... 15

    A. Governing Legal Principles ................................................................................ 15

    B.   Efforts To Find Experts Available For The Penalty Phase Of Trial ........................... 17

    C.  Efforts To Resolve The Case ............................................................................ 18

    D. Maintaining A Relationship With The Client. ...................................................... 18

    E. Guilt Phase Investigation .................................................................................. 19

    F.   Penalty Phase Investigation .............................................................................. 21

    G. Increase in Legal Issues Due to the Notices of Intent to Seek the Penalty of Death .... 21

V. Conclusion ........................................................................................................... 21

## I. Introduction

The government's July 9, 2025 notice of its intent to seek the death penalty, filed fifty-five days prior to trial, is untimely and unreasonable. Allowing the government to seek the death penalty at this late date will violate defendants' statutory right to notice of the government's intent to seek the death penalty a reasonable time prior to trial and constitutional right to due process

Just as courts recently did in the cases of *United States v. Wilson Arturo Constanza-Galdomez, et al.,* No. 1:22-CR-00409-SAG, ___ F.Supp.3d __, 2025 WL ***** (D. Maryland, June 18, 2025) and *United States v. Spurlock,* No. 3:23-cr-00022, __F.Supp.3d __, 2025 WL 1360499 (D. Nev. May 9, 2025), where the notice of intent was filed unreasonably close to trial,[1] this Court should strike the July 9, 2025 notices and prohibit the government from seeking the death penalty against Mr. Smith or Mr. Franklin.

Alternatively, this Court should continue the trial for a period of 28 months, the average in the nation from the filing of the Notice of Intent to trial.

## II. Background

On October 9, 2024, a federal grand jury returned an eleven-count indictment charging Defendants Franklin, Smith, and Batise with multiple capital punishment eligible offenses. Mr. Franklin appeared for his arraignment on October 22, 2024, and Mr. Smith appeared for his arraignment on October 29, 2024. (Docs. 30, 52). During both arraignments, the Court announced

---

1 Although both cases are admittedly distinguishable in that unlike here, the government sought to rescind a prior notice not to seek the death penalty, they still provide support for defendants' contention that striking a notice to seek the death penalty is one appropriate remedy for a delayed notice of intent. Alternatively, as explained below, defendants seek at least a 28 month continuance to provide appropriate time to prepare for trial.

a trial date of December 3, 2024.

On November 5, 2024, an unopposed motion to continue was filed jointly by all defendants (Doc. 83) and granted by the Court (Doc. 86) in order to permit additional time for preparation for trial and allow the government to engage in its mutli-step process to determine whether the government would seek the death penalty against Franklin, Smith, and/or Batise. The Court's Order (Doc. 86) designated the case as complex and continued the trial to March 24, 2025.

The Capital Case Section Committee met on January 6, 2025, to review this case on behalf of Mr. Smith and Mr. Franklin. Although the meeting was scheduled to occur in person at the Department of Justice in Washington, D.C., winter weather required the meeting to take place virtually. At the Committee's request, counsel for Defendant Franklin and Defendant Smith each presented what scant mitigating evidence they had been able to acquire in less than seventy days of representation and arguments as to why the government should not seek the death penalty in this case. At the conclusion of the meetings, the cases were submitted to the Committee for review.

On January 21, 2025, all defendants in the case filed a Joint Status Report (Doc. 87) advising the Court that the government had not yet issued a decision regarding whether a Notice of Intent to Seek the Death Penalty would be filed and was unable to give a timeline as to when a decision would be made.

On March 20, 2025, Mr. Smith filed an Unopposed Motion to Extend Scheduling Order Dates (Doc. 88), citing the government's failure to reach a decision about whether they would be seeking the death penalty and also citing a scheduling conflict with Mr. Smith's learned counsel. On March 24, 2025, the Court entered an Order (Doc. 89) resetting the trial date for September

2, 2025.

Both defense teams are ready and available to begin a noncapital trial on September 2, 2025. During the week of May 26, 2025, counsel for Mr. Smith spent a week interviewing fact witnesses across the state of Oklahoma and served trial subpoenas on multiple witnesses. Throughout the month of June, Mr. Smith's counsel focused on preparing their trial strategy and cleared their calendars to be available for a noncapital trial in September. Likewise, in the months since the Court continued the trial to September, Mr. Franklin's team has worked diligently to investigate all aspects of this case. The team has interviewed witness in multiple states, consulted with experts, and gathered voluminous documents. Mr. Franklin's counsel are available and prepared for a noncapital trial in September.

On July 8, 2025, the government issued a superseding indictment (Doc. 96) adding a single section entitled "Notice of Special Findings Pursuant to Title 17, United States Code, Sections 3591 and 3592", which would support a penalty of death. On July 9, 2025, only 55 days prior to trial, the government filed Notices of Intent to Seek the Death Penalty as to Mr. Franklin and Mr. Smith. (Docs. 102, 103).

### III. Legal Argument

**A.     This Court should strike the government's July 9, 2025 Notices of Intent to Seek the Death Penalty as untimely.**

This Court should strike the government's July 9, 2025 Notices of Intent to Seek the Death Penalty (Docs. 102 and 103) as untimely.

Section 3593(a) provides that:

> If, in a case involving an offense described in section 3591, the attorney for the government believes that the circumstances of the

offense are such that a sentence of death is justified under this chapter, the attorney shall, *a reasonable time before the trial or before acceptance by the court of a plea of guilty,* sign and file with the court, and serve on the defendant, a notice –

> (1)  Stating that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified under this chapter and that the government will seek the sentence of death; and

> (2) setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death.

18 U.S.C. §3593(a)(emphasis added).

Section 3593(a) is "a prophylactic statute, one of the chief aims of which is to protect the accused from having to endure a trial for his life for which he was not on reasonable notice, [which requires] inquiry into the objective reasonableness of the time between issuance of the Death Notice and the trial itself, in light of the particulars of the charged offense and the anticipated nature of the defense." *United States v. Ferebe,* 332 F.3d 722, 272 (4th Cir. 2003). Thus, a district court must conduct "a pretrial inquiry into the objective reasonableness of the [timeliness of the] notice provided." *Id.* at 731. A notice of intent to seek the death penalty that is filed in an "objectively unreasonable" manner with respect to the scheduled trial date must be stricken." *Id.*

The key holdings of the Fourth Circuit's decision in *Ferebe* concerning the timeliness requirement are as follows:

- Whether a defendant has been actually prejudiced as a result of an untimely notice of the government's intent to seek the death penalty is irrelevant. *Ferebe,* 332 F.3d at 732.

- "[E]valuation of the following factors, among others that may appear relevant, is necessary in order to assess the reasonable timeliness of a Death Notice: "(1) the

nature of the charges presented in the indictment; (2) the nature of the aggravating factors provided in the Death Notice; (3) the period of time remaining before trial, measured at the instant the Death Notice as filed and irrespective of the filing's effects; and, in addition, (4) the status of discovery in the proceedings." *Id.* at 737 (internal footnote omitted).[2]

- The existing trial date – and not a potential future trial date, if a motion for continuance were to be granted – is the key date of purposes of the timeliness analysis. *Ferebe,* 332 F.3d at 739; *see also id.* at 737 n.60. For that reason, the government's giving notice of its intent to seek the death penalty cannot serve as the basis for a continuance of the trial date. That is, an untimely notice cannot be rescued by delaying the existing trial date.[3]

Applying the four *Ferebe* timeliness factors in this case and considering other relevant facts and circumstances clearly demonstrates that the government's July 9, 2025 notices were untimely and, thus, must be stricken.

### 1.  Nature of the Charges

This factor strongly favors Mr. Franklin and Mr. Smith. First, this Court has already determined that this case is complex. *See* Doc. 86, p. 4. Therefore, it is particularly harmful to both Mr. Franklin and Mr. Smith to have to change their entire approach to the representation a mere fifty-five days prior to trial, when the issues in the case are complex and the discovery is substantial. The fact that the charges in the original indictment carried the death penalty as a possible punishment does not weigh against Mr. Smith and Mr. Franklin. *See United States v. Spurlock,* No. 3:23-cr-00022, ___F.Supp.3d ___, 2025 WL 1360499 (D. Nev. May 9, 2025) (striking a notice of intent to seek the death penalty, even though the government had initially filed charges that carried the death penalty as a possible punishment).

---

[2]    The four enumerated factors are a "non-exhaustive list of factors" for courts to consider, and no single factor is dispositive. *United States v. Breeden,* 366 F.3d 369, 374 (4th Cir. 2004).

[3]    *See also United States v. Hatten,* 276 F.Supp.2d 574, 579 (S.D.W.Va 2003)("[T]he Court must look at the trial date that was in existence at the time of [the] filing, even though the issuance of the Death Notice may affect the viability of the trial date."); *United States v. Ponder,* 347 F.Supp.2d 256, 267 (E.D.Va. 2004)("[I]f a trial date is continued because the filing of the Death Notice is too close to the trial date, the Death Notice is *per se* unreasonable.").

### 2.  Nature of Aggravating Factors

This factor also favors Mr. Smith and Mr. Franklin. Until the government's July 9, 2025 notice, no aggravating factors had been raised as something against which Mr. Franklin and Mr. Smith's counsel should be prepared to defend at the September 2, 2025 trial. In the Notices for both Mr. Franklin and Mr. Smith, statutory aggravators such as previous convictions and substantial planning and premeditation were added, as were non-statutory aggravators including obstruction of justice, status of the victim, future dangerousness and harmful impact on "family, friends and associates" of the Victim.  To properly investigate and defend against such factors, undersigned counsel would be required to devote substantial time and resources – in addition to spending an inordinate amount of time developing mitigating evidence.

### 3.  Time Remaining Before Trial

At the time that the government filed its July 9, 2025 notice, there were only 55 days remaining before the September 2, 2025 trial date. The question then is whether 55 days is sufficient to permit for an adequate defense at a capital murder trial. It simply is nowhere near enough time for several  reasons.[4]

Because the parties were not on notice that death was being sought, there have been no appointment of specialized mental health experts (e.g. a psychiatrist, psychologist, and neuropsychologist with experience in capital cases), who can assess Mr. Smith and Mr. Franklin

---

[4]  Because it takes so long for the defense (and the court) to prepare for a death penalty trial, the DOJ typically files a notice that it is seeking the death penalty long before a trial is scheduled to occur. In *Ferebe,* 332 F.3d at 725, the Fourth Circuit noted that "Ferebe presents some evidence, and the prosecution does not challenge it, that, nation-wide, federal prosecutors file Death Notices, upon authorization by the Attorney General, with an average of 8.4 months remaining before trial." 332 F.3d at 725. The average time between death penalty notices and scheduled trial dates has grown significantly since *Ferebe* was decided in 2003. During the past two decades, the average time between the authorization of a capital prosecution by the Attorney General and the start of a capital trial is *28 months.* **Appendices A and B** (Chart and Declaration of Matthew Rubenstein, Director of the Capital Resource Counsel (CRC), which is funded and administered by the Administrative Office of the U.S. Courts).

for intellectual disability and for mental health mitigation.[5] But such assessments are essential for an effective defense in a death penalty case. *See reprinted in* 31 Hofstra L. Rev. 913, 1061 (2003) ("Counsel should choose experts who are tailored specifically to the needs of the case, rather than relying on an 'all-purpose' expert who may have insufficient knowledge or experience to testify persuasively [in a capital case].").

In determining whether the government's July 9, 2025 notice of intent to seek the death penalty was filed in a reasonably timely manner based on the facts and circumstances of this case, this Court should consider the ABA's *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (Guidelines 10.2 *et. seq.*) and the *2008 Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases.* Guide To Judiciary Policy, Vol. 7A, Appx. 2A: *Model Plan for Implementation and Administration of the Criminal Justice Act,* XIV.B.10, at 26-27.[6]

The need for two attorneys (including at least one counsel who is learned and experienced in capital cases), a mitigation specialist, and appropriate expert witnesses reflects the fundamental Eighth Amendment requirement in capital cases that all relevant mitigating evidence must be admitted and considered by a capital sentencing jury. *See, e.g., Skipper v. South Carolina,* 476 U.S. 1 (1986). Similarly, the Supreme Court repeatedly has concluded that capital defense counsel provided ineffective assistance of counsel when they failed to investigate, develop, and use potentially relevant mitigating evidence during the capital sentencing phase. *See, e.g. Wiggins v. Smith,* 539 U.S. 510 (2003). Likewise, the Supreme Court

---

[5]    *See Atkins v. Virginia,* 536 U.S. 304 (2002) (holding that the Eighth Amendment prohibits a death sentence imposed on an intellectually disabled defendant).

[6]    Available at: https://www.uscourts.gov/sites/default/files/2025-01/guide-vol07a-2.pdf.

has envisioned capital defense counsel having a meaningful opportunity to defend against aggravating evidence offered by the prosecution. *See, e.g.*, *Barefoot v. Estelle,* 463 U.S. 880, 901 (1983) (assuming that "the adversary process can[] be trusted to sort out the reliable from the unreliable evidence" about an aggravating factor, with the capital defendant having "the opportunity to present his own side of the case" in aggravation). Just like developing mitigating evidence takes substantial time, so does preparing for a defense against the prosecution's aggravating evidence. *See United States v. Cuong Gia Le,* 316 F. Supp. 2d 343, 353 (E.D.Va. 2004).

In the present case, the defense's absence of preparation for a death penalty trial has occurred because the government waited eight months until bringing a superseding indictment with aggravating factors and then – just 55 days before the scheduled jury trial – filed a notice that the government is now seeking the death penalty. The significant period of time in which no preparation to defend against aggravating factors has occurred means that the defense must start entirely from scratch in defending against several of the aggravators in preparing for a capital trial that is commencing on September 2, 2025. Even assuming Mr. Smith and Mr. Franklin had the assistance of mitigation experts, the remaining time for preparation for a death penalty trial would be grossly inadequate in view of the "highly specialized and demanding litigation"[7] involved in a death penalty case. As the ABA's *Guidelines* recognize:

> In order to achieve the goal of providing capital defendants with high quality legal representation, the caseloads of their attorneys must be such as to permit the investment of the *extraordinary time and effort necessary to ensure effective and zealous representation in a capital case…* Studies have consistently found that *defending capital cases requires vastly more time and effort by counsel than*

---

[7] Guide To Judiciary Policy, Vol. 7, Defender Services, Part A, Guidelines for Administering the CJA and Related Statutes, *Chapter 6:Federal Death Penalty and Capital Habeas Corpus Representations, §620.30(b)(1)("Procedures for Appointment of Counsel in Federal Death Penalty Cases").*

> *noncapital matters…*In terms of actual numbers of hours invested in the defense of capital cases, recent studies indicate that several thousand hours are typically required to provide appropriate representation. For example, an in-depth examination of federal capital trials from 1990 to 1997 conducted on behalf of the Judicial Conference of the United States found that the total attorney hours per representation in capital cases that actually proceeded to trial averaged 1,899.

ABA Guidelines, Commentary to Guideline 6.1("Workload"), *reprinted in* 31 Hofstra L. Rev. at 967-68 (footnotes omitted; emphasis added); *see also* ABA Guideline 1.1 (Commentary to "Introduction"), *reprinted in* Hofstra L. Rev. at 925-26.

With respect to the capital sentencing phase, the *Guidelines* provide that *extensive* mitigation development must be done:

> Because the sentencer in a capital case must consider in mitigation, "anything in the life of a defendant which might militate against the appropriateness of death penalty for that defendant," "penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history." At least in the case of the client, this begins with the moment of conception.

ABA Guideline 10.7 ("Investigation") (Commentary), *reprinted in* 31 Hofstra L. Rev. at 1022.

The ABA's 2008 *Supplemental Guidelines* in detail set forth the  substantial and time-consuming work required to prepare for a capital sentencing phase.[8]  In a typical death penalty case, it takes

---

[8]    The *Supplemental Guidelines* provide, in particular, that:

> The defense team must conduct an ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record and any circumstances of the offense, or other factors, which may provide a basis for a sentence less than death. The investigation into a client's life history must survey a broad set of sources and includes, but is not limited to: medical history; complete prenatal, pediatric and adult health information; exposure to harmful substances in utero and in the environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multigenerational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; prior adult and juvenile correctional experience; religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.

> . . . Team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death. Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation.

Team members must endeavor to establish the rapport with the client and witnesses that will be necessary to provide the client with a defense in accordance with constitutional guarantees relevant to a capital sentencing proceeding.

. . . Team members must provide counsel with documentary evidence of the investigation through the use of such methods as genealogies, social history reports, chronologies and reports on relevant subjects including, but not limited to, cultural, socioeconomic, environmental, racial, and religious issues in the client's life. The manner in which information is provided to counsel is determined on a case by case basis, in consultation with counsel, considering jurisdictional practices, discovery rules and policies.

. . . It is the duty of the defense team members to aid counsel in the selection and preparation of witnesses who will testify, including but not limited to:

1. Expert witnesses, or witnesses with specialized training or experience in a particular subject matter. Such experts include, but are not limited to:
   a. Medical doctors, psychologists, toxicologists, pharmacologists, social workers and persons with specialized knowledge of medical conditions, mental illnesses and impairments; substance abuse, physical, emotional and sexual maltreatment, trauma and the effects of such factors on the client's development and functioning.
   b. Anthropologists, sociologists and persons with expertise in a particular race, culture, ethnicity, religion.
   c. Persons with specialized knowledge of specific communities or expertise in the effect of environments and neighborhoods upon their inhabitants.
   d. Persons with specialized knowledge of institutional life, either generally or within a specific institution.

2. Lay witnesses, or witnesses who are familiar with the defendant or his family, including but not limited to:
   a. The client's family, extending at least three generations back, and those familiar with the client;
   b. The client's friends, teachers, classmates, co-workers, employers, and those who served in the military with the client, as well as others who are familiar with the client's early and current development and functioning, medical history, environmental history, mental health history, educational history, employment and training history, military experience and religious, racial, and cultural experiences and influences upon the client or the client's family;
   c. Social service and treatment providers to the client and the client's family members, including doctors, nurses, other medical staff, social workers, and housing or welfare officials;
   d. Witnesses familiar with the client's prior juvenile and criminal justice and correctional experiences;
   e. Former and current neighbors of the client and the client's family, community members, and others familiar with the neighborhoods in which the client lived, including the type of housing, the economic status of the community, the availability of employment and the prevalence of violence;
   f. Witnesses who can testify about the applicable alternative to a death sentence and/or the conditions under which the alternative sentence would be served;
   g. Witnesses who can testify about the adverse impact of the client's execution on the client's family and loved ones.

. . . It is the duty of team members to gather documentation to support the testimony of expert and lay witnesses, including, but not limited to, school, medical, employment, military, and social

12

the defense team approximately 28 months from the notice of intent to prepare for trial. *See* Appendices A & B. [9]

Furthermore, by abruptly seeking to transform the long-scheduled trial from a non-capital trial to a death penalty trial, the government also has forced the defense to reassess its past approach to preparing for the guilt-innocence phase. As the ABA's *Guidelines* explain:

> Formulation of and adherence to a persuasive and understandable defense theory are vital in any criminal case. In a capital trial, the task of constructing a viable strategy is complicated by the fact that the proceedings are bifurcated. The client is entitled to have counsel insist that the state prove guilt beyond a reasonable doubt. At the same time, if counsel takes contradictory positions at guilt/innocence and sentencing, credibility with the sentencer may be damaged and the defendant's chances for a non-death sentence reduced. Accordingly, it is critical that, well before trial, counsel formulate an integrated defense theory that will be reinforced by its presentation at both the guilt and mitigation stages. Counsel should then advance that theory during all phases of the trial, including jury selection, witness preparation, pretrial motions, opening statement, presentation of evidence, and closing argument.

---

service records, in order to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state, intellectual capacity, and life history that may explain or diminish the client's culpability for his conduct, demonstrate the absence of aggressive patterns in the client's behavior, show the client's capacity for empathy, depict the client's remorse, illustrate the client's desire to function in the world, give a favorable opinion as to the client's capacity for rehabilitation or adaptation to prison, explain possible treatment programs, rebut or explain evidence presented by the prosecutor, or otherwise support a sentence less than death.

. . . It is the duty of the team members to aid counsel in preparing and gathering demonstrative evidence, such as photographs, videotapes and physical objects (e.g., trophies, artwork, military medals), and documents that humanize the client or portray him positively, such as certificates of earned awards, favorable press accounts and letters of praise or reference.

ABA, Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, *reprinted in* 36 Hofstra L. Rev. 677, 689-92 (2008).

[9]    Declarations from (1) **David A. Ruhnke**, a veteran "learned counsel" in death penalty cases; (2) **Susan Garvey**, a veteran mitigation specialist and attorney, who currently serves as National Mitigation Coordinator for the National Habeas Assistance and Training Project; and (3) **Russell Stetler**, also a veteran mitigation specialist, who retired as the director of the National Mitigation Coordinator for Federal Death Penalty Projects. Those projects are funded by the Administrative Office of the U.S. Courts.

ABA Guideline 10.10.1 ("Trial Preparation Overall") (Commentary), *reprinted in* 31 Hofstra L. Rev. at 1047-48.

Another time-consuming task required before a death penalty trial can occur is preparing questionnaires for prospective jurors, sending them to prospective jurors, and then analyzing them before *voir dire.* That process – which typically takes six to eight weeks – obviously has not yet begun and could not be completed prior to the trial date. *See Ferebe* at 2005 WL 1429261, at *7 (considering the lack of time to complete capital juror questionnaires to be a factor making the government's notice of its intent to seek the death penalty untimely). For all these reasons, the 55-day time period from July 9, 2025 to September 2, 2025, clearly is not an "objectively reasonable" time period in which undersigned defense counsel can adequately prepare for a death penalty trial.

4.  **Status of Discovery**

Although the government appears to have provided the majority and perhaps all of the discovery related to the *guilt-innocence phase,* no additional discovery related to the *capital sentencing phase* has been provided – including any discovery related to the "victim impact" evidence referenced in the Notices of Intent to Seek the Death Penalty. That fact also weighs in favor of striking the notice. *See Ferebe,* 2005 WL 1429261, at *7. In addition, if there will be a death penalty trial, undersigned counsel must again review the discovery related to the guilt-innocence phase to determine its relevance through the lens of capital defense counsel (which differs from the lens of a noncapital counsel). *See* ABA Guideline 10.10.1 ("Trial Preparation Overall")(Commentary), *reprinted in* 31 Hofstra L. Rev. at 1047-48.

For all these reasons, this Court should strike the government's July 9, 2025 notices.

**B. Permitting the government to seek the death penalty would violate the Fifth Amendment's Due Process Clause.**

The government's unjustifiable, prejudicial delay in waiting until 55 days prior to trial to announce they are seeking the death penalty, has substantially and irreparably damaged Mr. Franklin's and Mr. Smith's abilities to defend themselves at a capital trial (including, most significantly, at the capital sentencing phase.) *Cf. Betterman v. Montana,* 579 U.S. 437, 448 n.12 (2016) ("For inordinate delay in sentencing, although the Speedy Trial Clause does not govern, a defendant may have other recourse, including, in appropriate circumstances, tailored relief under the Due Process Clauses of the Fifth and Fourteenth Amendments…Relevant considerations may include the length of and reasons for delay, the defendant's diligence in requesting expeditious sentencing, and prejudice."). Under the circumstances of these last minute notices, Mr. Smith's and Mr. Franklin's rights to due process have been violated.

**IV. Alternatively, if the Court will not strike the Notices of Intent to Seek the Death Penalty, then the Court should continue the trial for a minimum of 28 months to allow sufficient time to prepare for trial and any potential sentencing phase.**

Without waiving their demand that the Notices of Intent be stricken, Mr. Smith and Mr. Franklin respectfully request that if this Court denies their motions to strike the Notices of Intent, that this Court continue the currently scheduled trial date of September 2, 2025 to September 2, 2027.

**A. Governing Legal Principles**

Pursuant to the requirements of *United States v. Toombs,* 574 F.3d 1262 (10th Cir. 2009), Mr. Smith and Mr. Franklin re-incorporate all the of the facts and arguments above in support of their request for an "ends of justice" continuance in this case under 18 U.S.C. §3161(h)(1)(D). Additionally, they respectfully also rely upon the following facts and authorities as good cause

15

for their request for a continuance of the trial in this matter.

Counsel needs additional time for effective preparation as permitted under 18 U.S.C. § 3161(h)(7)(B)(iv). Denial of additional time, given the information supplied to the Court here, will deprive Mr. Franklin and Mr. Smith of their right to a fair trial, to due process, to the right of the effective assistance of counsel – all within the meaning of the Fifth and Sixth Amendments. In addition, denial of additional time will violate their right to a reliable guilt and penalty determination, as guaranteed by the Eighth Amendment to the United States Constitution. The Sixth Amendment entitles a criminal defendant to more than mere legal representation; an accused has the right to the effective assistance of competent counsel. *Powell v. Alabama*, 287 U.S. 45, 58 (1932). To fulfill that constitutional guarantee and render effective assistance of counsel, counsel must be given adequate time to prepare for a case. *Id.* at 71 (discussing that inadequate case preparation can jeopardize an accused's right to effective assistance of counsel).

> [While] the Constitution nowhere specifies any period which must intervene between the required appointment of counsel and trial, the denial of adequate time for appointed counsel to confer, to consult with the accused, and to prepare his defense, could convert the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given the assistance of counsel.

*Avery v. Alabama*, 308 U.S. 444, 446 (1940). "The prompt disposition of criminal cases is to be commended and encouraged. But in reaching that result a defendant, charged with a serious crime, must not be stripped of his right to have sufficient time to advise with counsel and prepare his defense." *Powell,* 287 U.S. at 59.

Obtaining adequate time to properly prepare for representing a person facing death is essential. Defense counsel face difficult and time-consuming tasks in capital cases, especially considering that they operate without the resources available to the government. When a person's life

is at stake, counsel are required to exhaustively explore every factual and legal aspect of the "defendant's character . . . and any of the circumstances of the offense . . .," *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).

These constitutionally required efforts mean that defense counsel is effectively preparing for two trials. A capital trial differs from all other cases, not just by degree, but by kind. Counsel are functioning under the burden of the realization that the Government here is seeking the ultimate penalty of death. As a result, counsel must not only be prepared to defend the client against the charges, but counsel must effectively defend the client's life against the potential penalty.

Counsel has provided, *supra,* numerous examples of the guidelines that set forth the various duties and responsibilities expected of capital defense counsel as well as the minimum tasks expected by the Supreme Court as set forth in *Wiggins v. Smith, supra.* Strict adherence to these duties and responsibilities will necessitate a significant continuance in line with the average 28-month time period between the filing of a notice and trial dates discussed in **Appendices A&B.**

**B.  Payment delays also warrant a continuance.**

Appointed CJA counsel for Mr. Smith and defense team service providers are significantly hampered in their ability to conduct a fulsome capital defense investigation due to suspension in CJA payments between July 4, 2025, to October 1, 2025, and over two weeks of unavailability of the eVoucher system in June of 2025.  *See* **Appendix C.**  The defense team can only fund limited work out of pocket over these three months given that payment will not be forthcoming until October.  In addition, the delay in funding will limit counsel's ability to retain forensic and mental health experts, jury consultants, and other personnel who will be necessary to adequately prepare for a capital trial.

A continuance is justified on this basis alone.

## C.  Efforts To Resolve The Case

ABA Guideline 10.9.1 provides that defense counsel has a duty to seek an agreed resolution of the charges. Between the arraignments in October through July 9, 2025, the defense teams focused on obtaining the government's agreement to forego the death penalty. The defense team's efforts were thus directed at securing evidence and information that would persuade the government that neither this case nor these defendants deserved the death penalty. Those initial efforts were unsuccessful but, at least from the defense perspective, have not ended. Furthermore, DOJ protocols provide for deauthorization in light of changed circumstances and the defense teams intend to avail themselves of this process given that the initial mitigation presentation was done with very little time to prepare (less than seventy days).

## D. Maintaining A Relationship With The Client.

The ABA *Guidelines* note that "counsel at all stages of the case should make every appropriate effort to establish a relationship of trust with the client and should maintain close contact with the client." *Guideline* 10.5A. Further, "counsel at all stages of the case should engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have a material impact on the case." *Guideline* 10.5C. The defense team has spent a considerable amount of time in the last eight months on building relationships of trust with their clients and their families. Maintaining such relationships have, and will remain, time-consuming, especially considering Mr. Smith's closest family is located approximately five hours from Muskogee and both Mr. Smith and Mr. Franklin have significant relatives – and thus significant mitigation witnesses – outside of Oklahoma and scattered across the country.

**E. Guilt Phase Investigation**

*Guideline* 11.4.1 expressly provides that counsel must conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. The investigation for preparation of the guilt/innocence phase of the trial should be conducted regardless of any admission or statement by the client about facts constituting guilt. The ABA *Guidelines* further specify that counsel should investigate (1) potential witnesses, including "eyewitnesses or other witnesses having purported knowledge of events surrounding the offense" and (2) "physical evidence or expert reports relevant to the offense." ABA *Guideline* 11.4.1.

And the Commentary to *Guideline* 11.4.1, Investigation, provides: "Counsel's duty to investigate is not negated by the express desires of a client. Nor may counsel sit idly by, thinking that investigation would be futile." The attorney must first evaluate the potential avenues of action and then advise the client on the merits of each. Without investigation, counsel's evaluation and advice amount to little more than a guess. See also, *Jennings v. Woodford*, 290 F.3d 1006, 1014 (9th Cir. 2002), cert. denied, 539 U.S. 958 (2003) ("Attorneys have considerable latitude to make strategic decisions . . . once they have gathered sufficient evidence upon which to base their tactical decisions."). Case law applying the *Wiggins* standard demonstrates that, when a potentially helpful witness is identified, counsel has a duty to contact the witness and investigate the substance of the witness' knowledge. See *Lawrence v. Armontrout*, 900 F.2d 127 (8th Cir. 1990).

As to the guilt phase, the Guidelines again set forth the expectations of the profession about the obligations of counsel in capital cases. Of particular note, *Guideline* 10.7 states:

> 1. The investigation regarding guilt should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any

statement by the client that evidence bearing upon guilt is not to be collected or presented.

2. The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented.

The Commentary to Guideline 10.5 provides that the elements of the guilt phase investigation must include:

Potential witnesses (barring exceptional circumstances, counsel should seek out and interview potential witnesses, including, but not limited to: (1) eyewitnesses or other witnesses having purported knowledge of events surrounding the alleged offense itself; (2) potential alibi witnesses; (3) witnesses familiar with aspects of the client's life history that might affect the likelihood that the client committed the charged offense, the degree of culpability for the offense; (4) members of the victim's family).

This case is unique in that several key fact witnesses in this case have ongoing criminal proceedings in other state and federal jurisdictions. They are not – as more commonly encountered – co-defendants. They have no Fifth Amendment privilege, but they all have lawyers. As a matter of professional ethics, defense counsel must contact the witnesses' counsel to ask permission to interview the witness. The pendency of a Western District drug case, which the government is claiming played a part in the motive to kill the victim, makes typical witness interviews extremely complicated and involves multiple layers of lawyers. Furthermore, several witnesses are DEA agents, who must be cleared through the *Tuohey* process prior to being interviewed and/or compelled to testify. These complications come together to extend the time normally required to complete a guilt phase investigation.

Undersigned counsel are as yet unaware of the evidence the government intends to rely upon in order to establish all of the aggravating factors outlined in their Notices of Intent to Seek the Death Penalty. Whenever this discovery is turned over, it will require significant

investigative work.

**F.  Penalty Phase Investigation**

As explained *supra,* the critical factor in a capital case – which distinguishes it from even the most complex federal fraud or drug conspiracy – is the capital sentencing phase. The necessary investigation into mitigation is described above at length. Beginning in June and for the next three months, there are no more CJA funds available to pay Mr. Smith's mitigation specialist, investigator, and experts  or to pay for critical records that must be ordered before his counsel can even retain the necessary experts.

**G. Increase in Legal Issues Due to the Notices of Intent to Seek the Penalty of Death**

Counsel at every stage must exercise professional judgment under the Guidelines and consider all legal claims potentially available. Counsel must thoroughly investigate the basis for each potential claim, given the unique characteristics of death penalty law and practice. *Guideline* 10.8. Merely the filing of the Notices increases the number of pretrial motions significantly, some of which are very complex and constantly evolving and almost all of which will require lengthy briefing and oral argument, and likely additional evidentiary hearings. Furthermore, it is highly likely that at least one, if not all, the co-defendants in this case will be filing motions to sever, which could significantly impact the timing of the trials.

**V. Conclusion**

For all of the above reasons, the untimely filed July 9, 2025 Notices of Intent to Seek the Death Penalty should be stricken and this case should proceed to trial on September 2, 2025 as a non-capital trial.  Alternatively, should this Court deny the Motion to Strike the Notices of Intent, the trial in this case should be continued for 28 months to January 2, 2028.

21

Respectfully Submitted,

/s/ Thomas M. Wright
Thomas M. Wright, OBA # 20378
WRIGHT LAW FIRM, PLLC
629 West Main St. Suite 230
Oklahoma City, OK 73102
405.819.0888
tom@tomwrightlaw.com

/s/ Kathryn N. Nester
Kathryn N. Nester, *Pro Hac Vice*
NESTER LEWIS PLLC
40 S. 600 E.
Salt Lake City, UT  84102
801.535.4375
kathy@nesterlewis.com

*Attorneys for Marielle Tramanie Smith*

/s/ Kimberly Sharkey
Kimberly Sharkey
Carmen Brooks
Assistant Federal Public Defenders
411 E. Bonneville Ave., Ste. 250
Las Vegas, NV  89101
702.388.6577
kimberly_sharkey@fd.org
carmen_brooks@fd.org

/s/ Douglas G. Smith, II
Douglas G. Smith, II
Jill E. Webb
Gabrielle Jolliff
Assistant Federal Public Defenders
112 N. 7th Street
Muskogee, OK  74401
918.687.2430
douglas_smith@fd.org
jill_webb@fd.org
gabrielle_jolliff@fd.org

*Attorneys for Jason Javon
Franklin*

22